This case on the doctrine, Sean Fauley, et al., v. Applebee's Cross Accounts, v. Metropolitan Life Insurance, et al., defendants Applebee's, Chuck Clayton, Jr., Objector Account, Austin Distributed, Objector Account, Cross Applebee's. Arguing on behalf of the Objector Account, Attorney C. Jeffrey Tutt. Arguing on behalf of the Objector Account, Cross Applebee's, Attorney Kirk A. Kennedy. Arguing on behalf of the Applebee's, Attorney Michael Reiscus. Arguing on behalf of the Applebee's Cross Account, Attorney David M. Oppenheimer. Representing the defendants Applebee's, Attorney Mr. Daniel Seville. Thank you. Mr. Kennedy? Thank you, Your Honor, very much in court for being open to our ideas and for receiving me. This is the first time that I've argued in the Illinois Court of Appeals. And it's an honor to be here and argue in the same courts that Abraham Lincoln argued in. So thank you very much. I'm sorry? Abraham Lincoln argued in this court? Not in the Court of Appeals, but he did argue in the Supreme Court. I thought you meant in this building. And I'm here to answer questions, of course, about class action jurisprudence and how it fits into this. Let's start with the most simplest, shortest question. I want to take over, Justice Burkett's situation. If it wasn't your brief, it was Mr. Thut's that seemed to suggest that this is de novo review instead of abuse of discretion. Thank you very much. Could we have some clarification as to what the standard on review is? Absolutely. And I want to, that was the first point in my notes, was to discuss the standard review and be able to harness the standard review. Because in going back, as you know, as an appellate lawyer, you go back and you look at your briefs, this is not a de novo standard review. In the Illinois courts and in class action jurisprudence, they call it an abuse of discretion standard. But in class action, it's a relaxed abuse of discretion. So when the trial court does not apply the law correctly to the facts or when there are very clear, glaring errors in the application of the statutes or the precedents relating to class action, that can be an abuse of discretion. So it is, and both the federal appellate courts and even the Illinois Supreme Court talk about this need for heightened judicial scrutiny in the class action context. So while it is an abuse of discretion. And so abuse of discretion is basically defined that no reasonable person would adopt a view of the trial court. It's defined in Illinois law. So that's a pretty significant hurdle, isn't it? It is. And here's why, if you even look into that standard review, that this class action should not be approved. When you harness that standard review, it's because the class representatives as fiduciaries needed to be perfect. They needed to be perfect as a fiduciary. And so once the trial court was. Does the case law say they need to be perfect? A fiduciary needs to be perfect. Okay. The standard is high and if the fiduciary is not perfect and the trial court does not hold the fiduciary to that high standard, then therefore that fits into the abuse of discretion. Doesn't the case law say that the class representative has to adequately represent the class? As a general matter, that is the correct. But you're saying that it has to be perfect, not just adequate. It has to be beyond adequate. It has to be perfect. They're fiduciaries. They're the highest. It's the highest level. It's not only the duty of loyalty, but it's also the duty of care. And class action cases have, like in the voucher litigation case, which I encourage the court to read that came out of the Seventh Circuit. And I recognize that's not Illinois law, but it is helpful. You know, appellate courts are looking at these cases throughout the entire course of their evolution from the trial court up to the appeals court. And in this case in particular. When you say fiduciary, are you referring to the representatives of class or the attorneys for the representatives? Both are fiduciaries. This is black letter class action law. Both are fiduciaries. My recollection was that the attack relative to this point seemed to be primarily directed at the attorneys. Did you make some claims, but for the fact that two of the people, which the trial court, I believe, didn't give them $15,000 finder's fees or whatever you want to call it. Other than the fact that they were involved in other class action suits, what did they do wrong? Well, number one, the lead plaintiff, Sean Foley, he refused. He didn't appear for his deposition. He wouldn't agree to appear for deposition. He didn't even file a declaration, never appeared at any settlement hearings, but not come into a deposition to answer questions about. Remember, this is, these are all class representatives were put in that weren't in the case in Florida, were put in, that signed their settlement agreements the same day that the case was filed. So Sabone, Sabone, the class representative, and this is in the voucher litigation case. These class representatives have a duty to disclose. Okay, well, I have a longstanding relationship with Anderson Watson. They never did that. They never provided the trial court. And I understand that trial courts are, I mean, they've got a slew of information, a lot of cases, and things coming down the pike in a crowded docket, and they don't have law clerks. But, you know, that's why in the class action context, disclosure and coming to the court and saying, look, you know, Sabone's been a, has a longstanding relationship with this firm. And they received, you know, they're part of the class action, you know, processes and business of Anderson Watson. They never, they never did that. So that failure of disclosure, Your Honor, in our view is problematic from the class representatives because class representatives, they not only have a duty to disclose, but they have a duty to monitor class counsel and the defendant. Your Honor, it's not just one lapse of fiduciary duty or a footfall here. These are multiple systematic lapses and nondisclosures of information. And because of that, these multiple systematic lapses and failure to disclose and apparent breaches of fiduciary duty, the problem we have is we don't know if the settlement amount is sufficient or not. The system could not do an independent valuation with good litigation valuation metrics to determine whether this $23 billion that MetLife, a New York Stock Exchange company that's worth billions of dollars, whether that amount is enough or not. And I'm not here to tell you that it's low or high. I'm here to argue and submit to you that given the breakdown in the system and the failure of the fiduciaries, the class representatives and class counsel to disclose to the judge and the courts the constraints and the tensions that it was laboring under. Your argument is due, but let's assume for the sake of the arguendo that you have some points, legitimate points alleging some breakdowns along the way. Whose burden on appeal is it to show the impact or the implication of these problems and how it affected the fairness of the settlement? I mean, you can say they failed to do one through nine, but how do we know what the failure to do those things impacted in any way, you know, undermined the fairness of the settlement? Isn't that your burden to show us the impact of those things? Or do we just assume you're right? It's their burden to prove the adequacy of representation and that the burden of the settlement is fair. And in the absence of tight, valid processes that allow us to examine and processes that allow us to examine these issues, we don't know. It's their burden. Ultimately, it's their burden to prove fairness. But you're here on appeal. Yes. You don't have a burden on appeal. Can we just, you know, if you point to A, B, and C, then obviously the settlement agreement has to be thrown out because it must have been unfair, even though you're not showing a nexus between these alleged violations and how it undermined the settlement. But we are showing a nexus, Your Honor, because we're showing that it was impossible to come up with a correct settlement number. And I would point you to a case. There's a case that was not cited in our brief that we provided to you this morning. And if you don't read any of the cases, this is an important case to read. And it came out of the Seventh Circuit. It's called Reynolds v. Beneficial Bank. It's out of the Seventh Circuit. And the facts are very closely on point to this case. The settlement amount was very close, $25 million. Class counsel was found to not have discharged their duty. The trial court, the trial court, the appellate court found that the trial court did not really give this type of searching inquiry to the settlement. But the ruling in that case, Justice Hudson, and the holding of the analysis was the reason they reversed under an abusive discretion standard was that they couldn't – the processes broke down so much they couldn't determine whether the settlement amount of $25 million was fair or not. And Posner is saying, look, there's a way to value litigation and there's a methodology to do that. That was not done here. And because the processes were failed, and so they sent it back. Let me just ask you another question. I understand what you're saying. But in reading the record, did the trial court not go through each individual factor and make some findings of fact and conclusions? Or did the trial judges say, I find the settlement fair and reasonable? Because I read the record, the trial judge went through each required individual finding, did they not? Did the trial judge not address the factors? I mean, I'm looking at it here. The trial court did go through the Korshavt factor. The trial court missed some things. What did they miss? The trial – the adequacy of representation of the class representatives. There's no finding in the record. If this court goes back and looks at the record, the entire thousands of pages, there's not a single affidavit from any of the class representatives, from Foley, Savone, or anyone. None of them appeared at the settlement conference or the fairness hearing. It wasn't even an evidentiary hearing. How can the trial court – and I'm not – I'm deferential as a former law court to a trial court judge. I appreciate the constraints and the burdens that, you know, Judge Barones and the trial courts, you know, labor under. But that's why the disclosure was all that important. But the findings, if you look at the findings, they're rather conclusory. And there is not a finding as – on these adequacy issues that I believe satisfies this heightened level of judicial scrutiny in class action. And why is that? Because we've got millions, hundreds of thousands of people that aren't represented. That's the difference here. And that's why the only gatekeeper – there are only two gatekeepers – the judge and the objectors. And I'd like to talk very quickly – Any other questions? Your time is up, sir. Okay. Thank you, sir. Thank you. Good morning, Your Honor. Jeffrey Thun on behalf of Objector Clayton. Good morning. May it please the Court. In getting ready yesterday and looking at it and having done this a time or two before, I figured that the standard of review would be a question that the Court would have. And the differentiation – and I respectfully disagree with counsel – is that we're talking about due process rights here. And in the Supreme Court case of Jarreau v. Keith, that even though there's an abuse of discretion standard, the Court will apply a de novo standard of review. And that was also stated, again, by the First District in the Carole v. Healthcare Services element of the courts and made clear that the exercise of discretion is, of course, limited by the dictates of due process. Well, you're talking about the notice issues, not approval of the settlement. Yes, sir. But still, abuse of discretion with regard to approval of the settlement, due process issues, notice requirements, et cetera, that is your argument. That's de novo. You got it. Yes. That's exactly what the argument is, Judge. There's not a heck of a lot of Illinois state case law in the area of class actions. It does not take very long to go through almost every case. It is obviously litigated a lot in the federal courts. It's litigated in the Seventh Circuit. As the Court probably knows, Justice Posner has been very well written on the subject, and he has, in fact, stated exactly what Mr. Kennedy stated about the rules of objectors. The objector is the only check and balance on determining whether or not a settlement is actually fair for the class. It seems to me like both sides are kind of shouting at each other, both arguing their class representatives are shills and your objectors are shills. That's really what it boils down to. That is the argument. You're barking at each other. You're right. Do you agree with me? Yeah. And I'm astounded, honestly, because I've been through this game before. I got involved in this case about a year ago, and I was asked to act as local counsel for Judge Clayton, not for Chris Bandas. Did Bandas call me? Sure he did. He's the lawyer. But he said, this is what it is. This is what the law is. Could you go in and argue? And I said, of course I can. That's what I do. And now we're subjected to some of the worst mudslinging that I've ever seen in an appellate brief. So let's keep it clean. You're absolutely right. We should keep it clean. But that was the substance of the motion to strike that I had. With regard to the constitutional issues and the elbow issues that are addressed in our brief, I think the most egregious one is the one sentence in that notice that goes out to people that says, if you want the court to consider your objection, you must appear in open court in Waukegan, Illinois. Now, if that is not meant to have a chilling effect on objections, I don't know what is. What was this notice, the publication notice that was printed in the USA Today on three separate occasions? What was that about? That was the direct publication notice, Your Honor. I'm talking about the direct notice that was actually mailed out to my client, Mr. Clayton. And we quoted it on page 8 of our brief. And in that direct notice that Mr. Clayton received, it says, additionally, if you want the court to consider your objection, then you must also appear at the final approval hearing in room C-301 on November 14, 2014, at 9 a.m. You are not required to attend this hearing unless you object to this element. Why would they do that if they didn't want to discourage objectors? And honestly, this is a theme that was followed throughout the trial court proceedings. What about this language in People Actual Wilcox v. Equity Funding? Quote, under the complex factual picture of this litigation and with no one appearing before the trial court or this court who contends that the notice is deficient as to him, we are not prepared to say that all the factual matters necessary for determination of the issue of notice are presented in this record. We are not in a position to decide whether the notice was given was so deficient as to deny some members of the class due process. The court seems to be saying that you can require an objector to appear. I'm not sure what that district is out of. That's the Supreme Court. Oh, that's the Supreme Court. That's Illinois Supreme Court, the same court that said that we review a settlement for abuse of discretion. It's the same case. It's a leading case in Illinois. So that would seem to suggest that there's no problem requiring an objector to appear. I have not seen that one. And I can tell you, I think it's a relatively new case. I think this is probably the case of first impression. That's what I'm coming out of this court. Logistically, how do you make argument, present evidence? I know you can file an objection in writing. But how do you support your objection with evidence and argument if you're not there? We haven't quite gotten to the point where we're dealing with Skype in courtrooms, are we? So logistically, how is this unreasonable if you do want to object? There's something that suggests that there's some simplistic logic to the idea that if you're going to object, like if you're going to file an athlete's brief, then do it. You don't necessarily have to show up for oral argument. But then again, we're not triers of fact. You're not. And in a nationwide class action, logistically, it is impossible to require everybody that wants to object. And like I said, there's, what, $27 million, 27 million people in this class, I think they said? Well, I don't think even a million of them could have appeared in the courtroom if they decided to appear. I think you're absolutely correct. But the way to do it is to hire an attorney to go through discovery. And I know my time's up because I heard the buzzer. But the fact of the matter is, when anybody asked earlier as to what the judge really did wrong, not showing the objectors the discovery, not showing the objectors the time records, not showing the objectors the evidence that could show a conflict with counsel, that's wrong. Thank you much for your time, Judge. Thank you. Mr. Oppenheim? May it please the Court. We are here on a $23 million settlement in a TCPA fax case. At the time it was made, it was the largest TCPA fax settlement anywhere in the country ever, as far as we and as far as defendants are aware. It was the subject of three separate mediations plus a settlement conference with a federal magistrate judge. It resolved four separate pieces of litigation. And the actual documents were negotiated heatedly for months. The settlement was presented to the circuit court. Notice went out to the 2.7 million member class approximately. Out of that large universe, the apple seemed to fall all over and hit two objectors. Is there something inherently wrong with professional objectors? A lot of courts seem to think so. And I think that as long as someone is out looking out for fairness and for classes, that they can be useful. I know that there has been some case law that has said as much. I think when you get people who jump in. Well, they would be more than useful in the actions of the objectors. How is anybody going to be subjected to the test of fairness and reasonableness? So they're more than useful, aren't they? They can be, absolutely. And the circuit court, of course, considers things with respect to class settlements extensively with or without objectors. That's the point of Corshack. Corshack is not reserved for circumstances where you have an objector. But that certainly is another data point that can be given to a trial court. And the trial court had all the data in this case. And the trial court approved the notice, correct? The trial court absolutely approved the notice, yes. What about their argument, though, that notwithstanding the trial court's approval of the notice, that requiring objectors to appear was intended to keep objectors away? Requiring objectors to appear is necessary to allow the circuit court full and fair consideration of what the objections might be. And I think that was Justice McLaren's point. That when you have a hearing, an argument is presented, all sides are encouraged and required to show up. And this shouldn't be any different. And as we pointed out in our briefing, in addition to the language in Wilcox, the Federal Second and Third Circuits have specifically rejected this argument. This is an advocate system, isn't it? Or a system of advocacy where the whole premise of this State's judicial system is, is that there are supposed to be advocates on different sides of the issue. And if that is, in fact, the premise upon which the system is based, then how can it be evenhanded or balanced if the opposite view or the objector's view isn't available? Philosophically. We're not talking about whether or not these people are unethical or avaricious. We're talking about the system requires opposing views. I think the Latin motto of the Illinois Supreme Court is, hear the other side. Well, if you don't allow objectors, you're listening to silence. I think that's a fair point. And I think that the objectives… And why were your briefs so vindictive? Well, I think that, to put it most delicately, I don't think we're dealing with people who have the best interests of the class in mind. Well, didn't they at least raise objections and the trial court listened to the objections and granted them partial relief? So at least in one aspect at least, they were acting as advocates for a reasonable position? Actually, the modification made by the trial court was on the trial court's own initiative. That wasn't something raised by this particular crew of objectors. Justice McLaren just pointed something out about your briefs, and I also want to point something out about your briefs. Your citation of numerous authorities, string citing, is not approved. I apologize. It's Supreme Court Rule 341.87. I'm looking at a page, a page and a half of nothing but cites. These would be all of the examples of other approved settlements, and I'm not entirely sure how else to convey that, perhaps with an appendix. If I'm here again, I will certainly do it that way. Counsel, let me get back to the underlying essence of why we're here. You've heard other counsel argue as to what they believe are the deficiencies in the representations, their specific objections. Tell us before your time is up, in summary form if you wish, why we should uphold the settlement as fair and reasonable under the case law. Well, Your Honor, or Justice, the circuit court examined all of this in detail, and made the specific findings that there is no evidence that Anderson and Wantson has in any way breached its fiduciary duty to any of the class members. And this, I guess, is why our brief was so vindictive, because most of these attacks are kind of silly. You're saying the trial court made specific and adequate findings of fair conclusions of law? Absolutely. All the Korshak factors were included? All the Korshak factors were included. And I think it's telling that in neither of the objector appellate briefs or the reply briefs is Korshak cited. And if Your Honors don't have any further questions, I'll turn it over to my appellate. I have one question. You stated that you couldn't make it today for oral argument because you had a mediation, but you never told us where this mediation was supposed to take place. Oh, I apologize. It's actually going on as we speak in downtown Chicago. I will be heading there after a week. We didn't know whether it was in downtown Chicago or in Florida or wherever it might be. Okay. So next time. So next time, indicate whether or not you supposedly have airplane tickets and you've got a babysitter and your wife has got a shopping spree plan and all the other stuff. That was a given. Although, considering the amount of money involved and the number of lawyers, we still may not have granted this situation because, unfortunately, I have this bias. I believe that this court is a little bit more important than a mediation. And, Your Honor, I agree as well. The other was just scheduled first, and that's why I made the motion. Okay. Very good. Thank you. Mr. Reeses. Good morning, and may it please the Court. With me seated at the Council table is Mr. Mark Alpert of the Metropolitan Life Insurance Company, and I'm here today as defendant appellee. I would like to ask you a question. Certainly. Do you feel that this settlement agreement was reasonable? Your Honor, the way I would address that question is as follows. We had an opportunity to settle at a time when the law was in flux. In this case, there had been three cases pending in Florida beginning in 2012. Speak a little louder, please. I'm sorry. We had been involved in litigation since 2012, and in the summer of 2014, when the law was in flux, we had an opportunity to settle. And someone, a wise judge, once told me that sometimes a not so good settlement is better than a good appeal or a good trial. Okay? So on a compromise basis, we did what we thought was the right thing at the right time. There was a case pending in Florida by the name of Sarris, S-A-R-R-I-S, very favorable to us in the district court. It was up in appeal to the 11th Circuit. There had been an oral argument in June. There had been extensive negotiations in mediation, a couple of sessions of mediation with a certified mediator. There was a window of opportunity. There was a lot of risk on each side because Sarris was very favorable to us, but we didn't know if it would stand on appeal. And by the way, ultimately, it did not stand on appeal. It was reversed. By that time, we reached a settlement that was, we believe, in the best interest of all parties at the time it was reached. That's the long answer to a short question. To steal a page from your colleague, Justice Burkett. Another question? Yes. If we affirm the judgment, does that then moot your cross appeal? I don't have a cross appeal. The plaintiffs have a cross appeal with regard to it. So I'm only appearing one more time. Mr. Oppenheim claims that the objection should have been stricken. Is that correct? Yes, that is the cross appeal by the plaintiffs. We did not join that. Mr. Oppenheim, do you agree that if we affirm that your cross appeal is moot? I agree, Your Honor. Thank you. Okay. I will address Clayton's objections regarding the adequacy of notice and due process. In overruling the objections, the court found that the notice satisfied due process and Section 2-803. Note that 2-803 has written into it the words that the court in its discretion with regard to notice. There's no hard and fast bright line rule, is there? Didn't the Supreme Court say you take the requirements from the circumstances of each case? Exactly. Exactly. Exactly. Yes. And that's why you need to have discretion. Now, I think counsel for one of the objectors misspoke when he talked about the notice being mailed. It was not mailed. We have two different forms of notice. One was faxed directly, okay, to 2.8 million known members and newspaper publication to those members whose identity was not known. And we had two dedicated websites established by the settlement administrator, one for each form of notice. Now, the settlement administrator faxed a long form notice approved by the court directly to the 2.8 million fax numbers identified in discovery. Of those 2.8 million, 1.8 million received the long form, a success rate of nearly 66 percent and well within the parameters of past cases. The long form notice was two pages, and it came with a one-page proof of claim form. The long form did everything that any notice was supposed to do. It described the suit. It summarized the settlement. It identified the class threat and counsel. It set out all of the available options, including the right to submit a claim, to opt out, to do nothing, or to object. It gave the date and time for the final approval hearing, and it advised that the complete case file was available at the circuit court and that counsel could be contacted for additional information. The long form notice provided each recipient a unique random user ID and password and directed the recipient to the website to submit a claim or obtain additional information, including a copy of the settlement agreement and the preliminary approval order. The short form notice was published, I think Justice Hudson referred to it being published on two dates. It was published on three dates. The short form provided the case caption, identified the settlement class, and advised members that they were entitled to a share of the fund and that they could object. The short form also stated that the information about the settlement could be obtained by logging onto a website or by contacting class counsel. Do you know whether or not there were any phone calls to class counsel? I don't know that. I don't know that. I don't think it's in the record. The second website was available for the general public to obtain information or submit a claim without providing any login information. The landing page for the website contained information about the settlement, including a link to the long form notice, the settlement agreement, and the preliminary approval form. Now, Clayton argued in his brief that the class was not advised for the right to opt out. We didn't hear much about that today, and for good reason, because Clayton is wrong. All recipients of the notice were advised of their right to opt out and the opt-out procedure. Recipients of the long form were advised of their right to opt out and the procedure on the form itself. It's on the second page, paragraph D3. Recipients of the short form were directed to the public website that contained the same information, opting out as a false issue. Now, we did hear today about whether absent members' due process rights were violated because they had to appear at the fairness hearing. And I understand that that would be of some concern to the court. But I submit that this objection is merely hypothetical. First of all, Clayton and Austin both appeared through counsel and made all possible objections and then some. By the way, they weren't the only ones to make objections. There were three other objections that were received. So no one's rights were chilled because other people were able to object. And you know what happened? They withdrew their objections in two of those cases. We submit because the settlement was, in fact, in the best interest of the class. And most of those objections really were what you would expect. There were complaints about whether someone was really injured because of faxing or should metropolitan policyholders have to pay for the faxing or whether the class fees were too large. As Justice McClaren said, okay, there's an adversarial process. They were heard. They were heard through the objectors. And I'm not here. Of course objectors play a useful role. But the process was followed. Nobody's due process rights were violated. I know my time is up. And if there are no further questions, we would ask that you put behind us about four years of litigation and affirm a settlement that is in the best interest of the class and the parties. We ask you to affirm. I have a question. Yes. There was some mention that it was suspect that the settlement agreement came on such or at a very early point in time. Yes. In this litigation. It would appear that from what you've said today that that settlement agreement came about through lengthy negotiations in other litigation. Correct. Such that although it may be appearing precipitous in this particular litigation, it was not in so far as the relationship between the opposing parties. Correct. I mean, it goes back to the first suit was filed in 2012. There were multiple mediations. There was a lot of discovery. More than 20 depositions had been taken in that other litigation. There were thousands of pages of documents that were exchanged. Multiple experts were hired and dispositive motions had been filed and denied. We had the opportunity again, I think it was in 2014 sometime in May, to go through multiple days of mediation with a certified mediator. And because it's a complex process, that took some time. But over a period of time, we were able to reach a settlement that seemed to coincide with a new suit that was brought on behalf of an Illinois plaintiff. And they get to choose where to bring the suit. But it's part of the same litigation. So this is, in fact, the culmination of about three or four years of heavy litigation in multiple forms. For all the reasons we ask that you affirm. Thank you. Mr. Kennedy. The first defendant in that life wants this thing to settle because their exposure is over a billion dollars. And they're settling now. They're proposing a settlement and wanting to be part of the settlement at .01% of the possible damages. That mediation, Judge Justice McLaren, it was done a month. That mediation in 2014 was done a month after Anderson-Wants had been sued for fraudulent transfers in Cook County. And didn't disclose that to Judge Baronis or anybody else. In fact, not only didn't disclose, but blocked everyone's effort to try to investigate that. So, yes, MetLife wants the settlement. And, again, I go back to the basic point of if the trial court did not have sufficient information to make an informed decision, whether the settlement was too high or too low because of the failure to disclose and because of this structure of class actions where you have a collusion. Where is that collusion? The collusion is the – and I don't mean collusion in – Well, you know, you just talked about it. The collusion is – the collusion is in this sense. You're in a mediation between a plaintiff represented by a firm that is being sued for fraudulent transfers that wants to settle the case and a defendant who has a billion dollars worth of exposure, a New York Stock Exchange company. They want to get this thing settled as low as they can. And there's not a third party out there to monitor the merits of the settlement. And that's the collusive nature of these things. And here's the remedy. Here's the remedy I would like to propose that the court can adopt. Reverse, number one, Anderson-Lanza cannot proceed as class counsel. Independent settlement counsel needs to be appointed. Independent settlement counsel needs to be appointed to determine if the settlement value is too high or too low in conjunction with getting these disclosures of this information that was not provided to the trial court. And independent settlement counsel can then say, look, the settlement's fine. It should go forward after all information has been disclosed. Or the settlement counsel can tell Judge Baronis, look, there's – It's interesting that you're bringing up the lawsuit now in rebuttal. You didn't mention it in your opening remarks. Rebuttal should be reserved to respond to the arguments made. It was in our brief and – I understand that, but this is rebuttal. If you do not want me to talk about it, I can't. You asked if the settlement was collusive, and I was trying to explain the dynamics to – No, you were making the argument, and I'm just pointing out that rebuttal is for rebuttal, not for an argument that you bypassed in your opening remarks. Mr. Kennedy, you mentioned that it was over $1 billion. I think it was $1.4 billion, wasn't it? If you – yes, the math is $500 per TCPA violation multiplied by the number of offenses. It's $500 per violation, and would it be safe to say that's liquidated damages? Yes. Punitive damages? That number does not include punitive damages. What about compensatory damages? Based upon these facts, was the compensatory damages that might be available something in the area of about $0.17, $0.20 per page? I mean, back – maybe I'm wrong, but I used to go to the library and pay a dime a page to copy something, and I assumed that that machine was using the same paper and ink that the fax machine would use. So you're talking about 2 million plaintiffs who had $0.10 a piece damages in actuality, as far as compensatory damages are concerned, but $1.4 billion in so far as exemplary or liquidated damages? That would be the high range, but I understand your argument, Judge, is okay, well, the compensatory – I'm not making an argument. I'm just making an observation. The observation is the compensatory damages don't match the statutory damages. Well, what I'm getting at is we're supposed to determine whether or not this is reasonable, and if these plaintiffs actually lost $500 because it wasn't just one, but it was a ream of paper, or it was 10 reams of paper, or if this was a class action suit where people were actually injured personally, and we're talking compensatory damages as far as a window of liability is concerned, I think your argument would hold more weight with me individually. But when you argue exemplary damages or liquidated damages as being the basis upon which I'm supposed to use a benchmark, I'm not in a position to review what the trial court did and say, no, he should have decided that exemplary damages should have been, oh, 10% instead of 1% of the possible liability. I'm doing this for one reason. This is recorded for posterity, and nobody who listens to this would understand that when you say $500 that you're talking about not compensatory, but you're talking about a penalty that the statute creates. I'm not sure that that's a penalty. I just think it's a liquidated damages amount of $500 per violation. We can agree that it's called liquidated damages. It's a liquidated damages, and it's more than just the paper. It's the intrusive nature of a person having a phone line getting faxes, unsolicited faxes. Thank you. The case will be taken under advisement and a resolution or disposition rendered in F time. Court's adjourned.